664 So.2d 151 (1995)
NEW ORLEANS RIVERWALK ASSOCIATES
v.
ROBERT P. GUASTELLA EQUITIES, INC., et al.
ROBERT P. GUASTELLA EQUITIES, INC.
v.
NEW ORLEANS RIVERWALK ASSOCIATES, et al.
Nos. 94-CA-2092, 94-CA-2093.
Court of Appeal of Louisiana, Fourth Circuit.
November 16, 1995.
Reasons for Denying Rehearing December 19, 1995.
*153 William R. Forrester, Jr., William S. Penick, Thomas M. Benjamin, Lemle & Kelleher, New Orleans, and Marie R. Yeates, Sheryl L. Hopkins, Gwen J. Samora, Vinson & Elkins, Houston, Texas, for New Orleans Riverwalk Associates, New Orleans Riverwalk Limited Partnership, Connecticut General Life Insurance Company, Rouse-New Orleans, Inc. & Rouse Company.
William E. Brown, Covington, Jacques F. Bezou, Robert H. Matthews, Bezou & Matthews, Mandeville, for Robert P. Guastella Equities, Inc., Robert P. Guastella, Charles Kovacs, Donald Guastella, David Guastella, Darren Guastella, and Debra Guastella.
Before SCHOTT, C.J., and BYRNES and LOBRANO, JJ.
Reasons for Denying Rehearing by Judge Lobrano December 19, 1995.
BYRNES, Judge.
In this consolidated case, New Orleans Riverwalk Associates, New Orleans Riverwalk *154 Limited Partnership, Connecticut General Life Insurance Company, Rouse-New Orleans, Inc. and the Rouse Company (collectively "Riverwalk"), appeals a judgment in favor of Robert P. Guastella Equities, Inc. (collectively "Guastella") for damages arising from a lease agreement. Guastella answered the appeal. We amend and affirm.
On October 10, 1988 Guastella signed a ten-year lease agreement with a five-year renewal term with Riverwalk. Guastella built a Howard Johnson restaurant known as HJ's Great American Cafe ("HJ's Cafe") on Spanish Plaza next to the entrance to Riverwalk mall. Guastella was responsible for constructing the restaurant with Riverwalk's approval of the plans. Riverwalk did not approve Guastella's plans to build a higher level floor or drainage wall to aid in preventing flooding. HJ's Cafe opened in January 1989. After encountering various problems, including many days of flooding, Guastella filed for bankruptcy.
In December 1989 Riverwalk began eviction proceedings in civil district court and filed a petition against Guastella for past due rent, attorney's fees and interest, for termination of the lease and for writ of sequestration. Guastella filed Chapter 11 proceedings in federal bankruptcy court, and the eviction proceedings were stayed in civil district court. The bankruptcy court granted Guastella's motion to assume the lease, provided it brought the past rent current and began paying future rent on time. Guastella paid rent for February through May 1990 and a $6,000 partial payment on October 30, 1990, but Guastella did not pay for rent accrued from May 1989 through January 1990.
On November 8, 1990 Guastella, the former tenant, brought an action in civil district court against Riverwalk, lessor, for intentional wrongdoing, bad faith breach of lease, conspiring to commit unfair trade practices and intentional tort. Guastella claimed that Riverwalk attempted to drive Guastella out of business when Riverwalk tried to stop liquor sales, refused to fix drainage problems, interfered with the air conditioning system for two and one-half months, tried to cut off live entertainment as well as the outside bar and brought in competitors. Guastella also claimed that Riverwalk failed to provide for security.
In December 1990 the bankruptcy court terminated the lease and Guastella vacated the premises. Thereafter, the cases in civil district court were consolidated. The trial court granted two peremptory exceptions asserted by Riverwalk. The trial court dismissed Guastella's future lost profits claim on the grounds of res judicata based on the claim that the bankruptcy court had evicted Guastella. The trial court also dismissed all damage claims arising from the temporary restraining order issued by the bankruptcy court, which enjoined Guastella from use of outside entertainment and an outside bar. This court granted Guastella application for writs on the exception concerning future lost profits and ordered that the future loss claim be tried.
After a jury trial commenced on October 11, 1993, the jury reached its verdict on October 28, 1993. In answering the jury interrogatories, the jury found that Riverwalk committed four breaches of the lease in bad faith; negligently and intentionally interfered with Guastella's business to prevent Guastella from meeting its obligations for the payment of the rent due under the lease; and conspired to commit an unfair trade practice. The jury allocated the following damages for the four problems:

Drainage $250,000
Air Conditioning $148,000
Restrictions on entertainment $150,000
Restrictions on outdoor bar $300,000

The jury found that Guastella failed to mitigate the drainage problem in the amount of $35,000. The jury also awarded Guastella $300,000 for the loss of the net leasehold investment. The jury awarded Guastella $14,800,000 for future lost profits, and the jury found that Guastella failed to mitigate future lost profits in the amount of $4,000,000. Guastella's total future lost profits, reduced for failure to mitigate were $11,913,000. The trial court reduced the total jury award to $9,530,400 based on the jury's finding that Riverwalk was 80 percent at fault, and Guastella was 20 percent at fault.
*155 The trial court awarded prejudgment interest and attorney's fees in the amount of $450,000 to Guastella based on the jury's finding of unfair trade practice. The trial court found that The Rouse Company was liable in solido with Riverwalk based on the jury's finding that The Rouse Company conspired with Riverwalk to commit an unfair trade practice and to interfere with Guastella's business.
With respect to Riverwalk's claims, the jury awarded Riverwalk $187,406 for unpaid rent, $143,380 in interest, and $72,000 in liquidated damages for Guastella's breach of the lease for a total of $402,786. The trial court awarded Riverwalk $25,000 in attorney's fees.
After the trial court rendered its judgment of January 7, 1994 and its amended judgment on May 6, 1994, including its award of legal fees, Riverwalk appealed, and Guastella answered the appeal.
On appeal Riverwalk contends that Guastella: failed to provide evidence of causation or proof of the four elements of past damages; has no claim for future loss profits; failed to prove leasehold improvements by the best evidence; and has no claim for attorney's fees under the statute. Riverwalk also claims that the jury erred in its conspiracy findings, and the trial court erred in awarding prejudgment interest on future loss profits.
Guastella argues that the trial court erred in: applying 20 percent comparative negligence to damages awarded for bad faith breach of lease and unfair trade practice; finding that Guastella failed to mitigate damages after eviction; and awarding liquidated damages and attorney's fees to Riverwalk. Guastella avers that members of the Guastella family stated causes of action for intentional infliction of emotional distress and other intentional torts.

CAUSATION
Findings as to fault are factual and should be upheld on appeal unless clearly wrong. Garrett v. Celino, 489 So.2d 335 (La.App. 4 Cir.1986). Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Virgil v. American Guarantee and Liability Ins. Co., 507 So.2d 825 (La.1987); Moore v. Gencorp, Inc., 92-2049 (La.App. 4 Cir. 6/30/94), 641 So.2d 592, 598. Where there are two permissible view of the evidence, the fact finder's choice between them cannot be manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La.1989). To reverse a fact-finder's verdict, the appellate court must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Although the reviewing court must accord deference to the fact finder, it must be cognizant of its constitutional duty to review the facts, not merely to decide if it would have interpreted the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La. 7/5/94), 639 So.2d 216, 221.
Guastella provided evidence supporting its claims that Riverwalk breached the lease agreement in bad faith, intentionally interfered with the operation of the restaurant, and caused the tenant's business to fail.
Riverwalk rejected the plans of Guastella's Roland Alpha, the restaurant's architect, to build a four inch slab to prevent water from running into the building and to design the building with a six inch curb or retainer wall to keep water out. Mrs. Deborah Guastella testified that Guastella was not allowed to install a canopy in the front of the cafe like the one in front of LeMoyne's Landing. Instead Guastella used umbrellas over outside tables. A canopy would have provided outside customers with more protection from the rain than the individual table umbrellas.
Riverwalk complains that Guastella failed to show that it flooded on days that Guastella claimed; however, Guastella employees testified that small amounts of rain caused flooding in the cafe on days when it did not rain throughout the City. Although Kurt Steiner, Riverwalk's expert certified public accountant, *156 testified that there was no water in the City's nearest water gauge on June 30, 1990, Guastella showed photographs of ankle-deep water in the cafe on that date.
Guastella provided testimony that Riverwalk promised that Rouse would fix any flooding problem, but failed to take any actions to prevent flooding. Joseph Piccolomini, Riverwalk's previous manager, stated there was no such agreement. Mr. Robert Guastella testified that he relied on the word of Joseph Piccolomini, and stated that Riverwalk paid for drainage at LeMoyne's Landing, the other restaurant located on the Spanish Plaza. Both parties claimed that the other party was responsible for repairing the drainage problem.
When it was having its fence and sign painted, Riverwalk wrapped plastic sheets over the rear and sides of HJ's Cafe, blocking the air-conditioner vents and shutting them down for two and a half months in April, May, and June 1990. Guastella pointed out that the time period was longer than it took to build the restaurant. Mr. Guastella testified that the air conditioner units didn't work properly again after the draping was removed.
Robert Guastella explained that most of the cafe's business depended upon having live entertainment and serving alcoholic beverages. Although Riverwalk's prior manager, Joseph Piccolomini, testified that originally HJ's Cafe was not intended to be an entertainment place, in his deposition he agreed that the original intent was for the cafe to include entertainment. Riverwalk's manager, Brian Lade, showed no written complaints from the World Trade Center about noise from the restaurant's bands when he testified that the World Trade Center threatened to terminate the Spanish Plaza lease because of the noise; however, in its correspondence the World Trade Center complained of noise from bands at LeMoyne's Landing, which was located closer to the Trade Center. Riverwalk showed that the lease gave Riverwalk the right to regulate noise levels of HJ's outside entertainment, but also noted that the use clause did not provide for entertainment. Lade testified that tenants inside the Riverwalk mall complained that HJ's outdoor bands were too loud.
James Green, owner of Tipitina's, testified that he met with Brian Lade in 1990 to schedule special events such as Lundi Gras, July 4, and Labor Day where Tipitina's would have exclusive concessions for all beverages and music on Spanish Plaza. However, Tipitina's encountered competition with LeMoyne's Landing and HJ's Cafe. Green related that Brian Lade was not a man of his word. Green stated that although Tipitina's had a verbal contract with Brian Lade for $20,000 to pay for the Neville Brother's band for Lundi Gras 1991, shortly before Mardi Gras, Green found that Riverwalk had contracted with the Radiators, another band, without notifying Green. Brian Lade later denied knowing anything about the Neville Brothers. Through an attorney, Riverwalk agreed to pay $5,000. Green pointed out that although Riverwalk denied any knowledge about the Neville Brothers, in the Mardi Gras guide pamphlet, there was a full back page ad showing "Riverwalk Lundi Gras featuring Neville Brothers." The record provided evidence upon which the jury could discredit the testimony of Brian Lade.
Guastella presented testimony that Riverwalk, Rouse and LeMoyne's Landing negotiated opening a joint venture Spanish Plaza bar with outside entertainment while Riverwalk curtailed HJ's Cafe's outside entertainment and liquor sales. James Green testified that Brian Lade told him to set Tipitina's booths on the Spanish Plaza next to HJ's Cafe to take business away from the cafe. Brian Lade admitted that he negotiated with Tipitina's and others to rent out HJ's Cafe's space.
Although Guastella worked out an agreement for a payment plan for past due rent, which was signed by Riverwalk's credit manager on November 2, 1989, Riverwalk sent notices to vacate and filed an eviction suit against Guastella for non-payment of rent. Further, in September 1990 when Guastella obtained an investor, Franchise Associates, which was the franchisor for many Howard Johnson restaurants, to invest $250,000 into the cafe, Riverwalk blocked the investment by its proposal limiting Franchise Associates *157 and HJ's Cafe to outside liquor service upon approval of Riverwalk and by not allowing any entertainment. In contrast with respect to its treatment of LeMoyne's Landing, Riverwalk worked out a payment plan to pay LeMoyne's past due rent, Riverwalk did not file an eviction suit, and Riverwalk did not limit LeMoyne's liquor sales or prohibit all entertainment.
Mr. Robert Guastella pointed out that after HJ's Cafe closed, although Riverwalk did not approve of Guastella's plan for a slab on the Spanish Plaza, Riverwalk paid for a slab at the same location for its new tenant, Nature Company, which was given $328,000 for construction costs whereas Riverwalk extended $120,000 for construction costs to Guastella. Although Riverwalk rejected Guastella's plans to put air condition compressors outside, Riverwalk approved the outside compressor installed by the Nature Company.
The jury was not manifestly erroneous in finding that Riverwalk caused the damages claimed by Guastella.

DAMAGES
The trial court adopted the jury verdict with respect to the amount of the damage award. Consideration of the jury's determination of damages is limited to a review for abuse of discretion on appeal. The discretion vested in the trier of fact is "great," and even vast, in determining the amount of damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), certiorari denied, Maritime Overseas Corp. v. Youn, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). When damages are insusceptible of precise measurement, much discretion is left to the court for its reasonable assessment. La.C.C. art. 1999; Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976). The reviewing court must evaluate the particular injuries and their effects on the particular injured persons. Reck v. Stevens, 373 So.2d 498 (La.1979). Only after a determination of an abuse of discretion is a resort to prior awards appropriate, and then only for the purpose of determining the highest or lowest point that is reasonably within that discretion. Youn, supra.

LOST PROFITS
Riverwalk contends that Guastella failed to prove lost profits with reasonable certainty under Borden, Inc. v. Howard Trucking Co., Inc., 454 So.2d 1081, 1092 (La. 1983). A claim for lost profits based solely on the testimony of the injured party and unsubstantiated by other evidence does not constitute reasonable certainty. Louisiana Joint Underwriters of Audubon Ins. Co. v. Gant, 439 So.2d 1153, 1157 (La.App. 4 Cir.), writ denied, 443 So.2d 589 (La.1983). Riverwalk argues that the jury spread around a lump sum amount of damages although the jury was instructed to find separate proof of each of the four independent elements of damages.
Guastella used the $1,500,000 projected sales figure which Riverwalk's previous manager, Joseph Piccolomini, designated for HJ's Cafe's business in 1989-1990, where there were five million visitors in the Spanish Plaza. Guastella points out that Piccolomini's notes written at the time of the lease reflected the $1.5 million annual figure, and Piccolomini referred to that figure in his tape recorded conversation.
Dr. Ivan Miestchovich, Guastella's expert in the field of estate marketing analysis and retail marketing analysis, agreed that Robert Guastella's figures were reasonable based on various documents including the retail market analysis prepared for Riverwalk in September 1993. That analysis reported that seven out of ten overnight visitors come to the Riverwalk. Dr. Miestchovich agreed that the $1.5 million figure divided by the rate of five million annual visitors equals 30 cents expenditure by each visitor or one in 27 visitors spending $8 or a capture rate of 3.8 percent was reasonable. The Riverwalk report reviewed the effect that the aquarium, enlargement of the Convention Center, river boats and casino gambling would have on the increased number of tourists to the Spanish Plaza. Tipitina's owner, James Green, testified that Riverwalk gave body count projections of what Tipitina's could expect.
Riverwalk also asserts that when a plaintiff fails to mitigate damages, he cannot recover *158 lost profits, but only the cost of repairs under Weill Constr. Co. v. Thibodeaux, 491 So.2d 166 (La.App. 3 Cir.1986), and Tesvich v. 3-A's Towing Co., 547 So.2d 1106, 1110 (La. App. 4 Cir.), writs denied, 552 So.2d 383, 384 (La.1989). Riverwalk notes that Guastella testified that it would have cost $35,000 to place additional drains around the cafe.
In Weill, supra, from a contractor of a defective slab for a skating rink, the plaintiffs were able to recover damages for the amount necessary to complete the work, the necessary repair caused by the breach, and for the losses that resulted from the non-compliance of the contract. In Tesvich, supra, damages could not be obtained for alleged loss of profits from the sale of oysters from the time the oyster bed had been destroyed through activities of tug boats until judgment; however, such damages could be recovered for an estimated three-year period following the judgment until reconstructed oyster beds provided a full harvest.
In the present case, the record shows that when Riverwalk would not allow Guastella to build a higher slab or drainage wall, Riverwalk's manager, Piccolomini, verbally promised to take care of any drainage problems. Riverwalk built drains at LeMoyne's Landing at Riverwalk's expense. Not only was Riverwalk liable on the contract, but it is also liable for past damages based on lost profits because Riverwalk also committed intentional torts in prohibiting Guastella from carrying on its business.
A degree of arbitrariness is inherent in the process where there is an apportionment of damages from different causes. In Adams v. Lammon, 93-1288 (La.App. 4 Cir. 3/29/94), 635 So.2d 373, writ denied, 94-1545 (La. 9/23/94), 642 So.2d 1301, this court upheld an apportionment of damages equally between two automobile accidents in which the victim was involved, where there was testimony by physicians that each accident caused the victim's condition and the effect of each could not be apportioned. In the present case the jury's compilation of past damages, which allocated the most damages for restrictions of the outdoor bar at $300,000 was reasonable where the record showed that the cafe made most of its money from its liquor sales. Because the drainage problem created the greatest physical detriment to the business, the jury's award of $250,000 was also reasonable. We cannot find that the jury abused its discretion in determining the allocations of $148,000 for lost profits for several weeks where business was diminished because the cafe had no air conditioning, and $150,000 because of restrictions on live entertainment.

FUTURE LOST PROFITS
Riverwalk argues that a judicial eviction terminates any cause of action for future lost profits based on wrongful eviction. Woods v. ABC Ins. Co., 580 So.2d 480, 481-82 (La.App. 4 Cir.1991). Riverwalk also claims that the federal bankruptcy court's order of eviction bars Guastella's claim for future lost profits under federal res judicata principles. Pilie & Pilie v. Metz, 547 So.2d 1305, 1308-09 (La.1989). However, in the present case at the clarification hearing, the bankruptcy court stated that the issue of damages was not litigated or decided in bankruptcy court. Further, on application for writs, this court reversed the civil district court's ruling maintaining Riverwalk's exception of res judicata, and this court ordered the trial court to try the issue of future profits.
Generally, the appellate court's disposition on the issue considered on application for writs usually becomes the law of the case, foreclosing further litigation of that issue either by the trial court or in the appellate court on a later appeal. Easton v. Chevron Industries, Inc., 602 So.2d 1032, 1038 (La.App. 4 Cir.), writs denied, 604 So.2d 1315, 1318 (La.1992). However, application of the law of the case doctrine is discretionary in supervisory writ applications and does not apply in cases of palpable error or where, if the law of the case were applied, manifest injustice would occur. Tolis v. Board of Sup'rs of Louisiana State University and Agriculture and Mechanical College, 94-1444 (La.App. 4 Cir. 5/16/95), 655 So.2d 747, 751. Under federal precepts, the claim preclusion doctrine applies to bar a subsequent action on res judicata principles where parties or their privies have previously litigated the same claim to a valid final judgment; however, *159 the principles of res judicata is not applicable unless all the essential elements are present and each element has been established beyond all question. Tolis, id. at 753.
In the present case, the issue of loss of future profits had never been litigated to a valid judgment. Thus, the policy reasons behind the federal claim preclusion doctrine do not require application of the res judicata principles. Because no manifest injustice or palpable error occurred, this court's previous holding is the law of the case. Further, as discussed previously, the case involves damages for intentional torts as well as damages derived from wrongful eviction for breach of the lease.
Riverwalk asserts that Guastella failed to prove with reasonable certainty that Guastella would have made any future profits, much less $14,800,000. Riverwalk contends that the estimate of damages should be based on: (1) historical sales of the business; and (2) sales of a comparable business. Riverwalk asserts that Guastella introduced no business records to show past damages; however, Guastella contests that its prior records could not be used to establish lost profits because the cafe was immediately affected by the problems created by Riverwalk. Although Riverwalk argued that LeMoyne's Landing was a comparable business, Guastella provided testimony that: (1) LeMoyne's location was not as advantageous as HJ's Cafe's location right next to the entrance of the Riverwalk; and (2) LeMoyne's Landing under-reported its sales so that its figures were inaccurate.
As previously noted, Guastella relied on Riverwalk's calculations of $1.5 million projected annual profits at the time of the lease and the 5,000,000 visitor count for the year 1989 to project future lost profits. Where future lost profits are insusceptible of precise measurement, the jury is given much discretion for their reasonable determination. We cannot find that the jury abused its discretion in its $14,800,000 award for future lost profits for the remaining years of the potential 15-year lease.

LEASEHOLD IMPROVEMENTS
Riverwalk contests the jury's award of $300,000 for net leasehold improvements based on its claim that Guastella improperly used summary evidence without underlying documentation. Riverwalk maintains that Guastella did not provide the best evidence, i.e., proof by invoices and statements of alleged expenditures for construction of the restaurant. Riverwalk's expert, Kurt Steiner, testified that there were a total of $215,204 in checks, but he questioned cash checks and some checks paid to Peyton Place, a Guastella corporation, and to family members without supporting invoices. He eliminated those checks without supporting invoices and concluded that the amount of proved construction expenditures amounted to $127,623 whereas Riverwalk gave Guastella a $140,000 construction allowance. Riverwalk claims that because the construction allowance was more than the amount of the invoices, there was no evidence that Guastella sustained damages for leasehold improvements.
The trial court admitted Guastella's summary and itemization of net development costs into evidence. La.C.E. art. 1006 allows the use of summary calculations with supporting documents. Bevpac Properties v. Stakelum, 94-0395, p. 3 (La.App. 4 Cir. 9/29/94), 645 So.2d 1170, writ denied, 95-0107 (La. 3/10/95), 650 So.2d 1185. Robert Guastella, owner of HJ's Cafe, testified as an expert witness in the field of restaurant financing and projection for restaurant business based on his past experience in the hotel and restaurant business for 25-30 years. Guastella attested to the accuracy of the summary. Without supporting documentation we cannot find that Guastella provided evidence of development costs upon which the jury could base its award of $300,000 in leasehold improvements. Although Guastella may have paid for leasehold improvements, without the underlying documentation Guastella failed to prove that the amount was greater than the amount of construction allowance provided by Riverwalk.

ATTORNEY'S FEES UNDER UNFAIR TRADE PRACTICES ACT; CONSPIRACY TO INTENTIONALLY INTERFERE WITH BUSINESS
Riverwalk contends that the trial court erroneously awarded Guastella attorney's *160 fees based on the jury's finding that Riverwalk and Rouse Company committed an unfair trade practice under the Unfair Trade Practices Act, La.R.S. 51:1401 et seq. Riverwalk asserts that Guastella is not a consumer or business competitor so that the Act does not apply in this case.
The courts are to decide on a case by case basis what conduct is violative of the statute. Davis v. Manpower Intern., Inc., 623 So.2d 946 (La.App. 4 Cir.), writ denied, 629 So.2d 1173 (La.1993). In the present case the jury instruction required that the jury find that Riverwalk was a competitor in order to find an unfair trade practice. Guastella provided evidence that Rouse, Riverwalk and LeMoyne's Landing negotiated for a joint venture for an entertainment center in competition with HJ's Cafe with Riverwalk funding the project and receiving part of the gross sales. Riverwalk brought in entertainment and commercial activities, and entered agreements with Tipitina's while requiring HJ's Cafe to stop its entertainment and curtailing its liquor sales. Riverwalk negotiated with Tipitina and others to rent out HJ Cafe's space. The jury did not abuse its discretion in finding that Riverwalk was a competitor under the Unfair Trade Practice Act and that Riverwalk intentionally conspired to interfere with Guastella's business. The award of attorney's fees was proper.

PREJUDGMENT INTEREST ON FUTURE LOST PROFITS
Riverwalk avers that the trial court erred in awarding pre-judgment interest on future damages under O'Bryan v. Folk Constr. Co., 594 So.2d 900, 908 (La.App. 4 Cir.1991), and Martin v. Walk, Haydel & Associates, Inc., 794 F.2d 209, 212 (5th Cir. 1986), which apply to admiralty cases under the Jones Act. However, in non-maritime Louisiana cases, interest is proper from the date of judicial demand. Schackai v. Tenneco Oil Co., 436 So.2d 729, 735 (La.App. 4 Cir.), writ denied, 440 So.2d 759 (La.1983); Anthony v. New Orleans Public Service, Inc., 449 So.2d 666, 669 (La.App. 4 Cir.1984), writ denied, 450 So.2d 968 (La.1984). The trial court correctly awarded interest on future lost profits from the date of judicial demand.

COMPARATIVE NEGLIGENCE
With respect to its answer to the appeal, initially Guastella contends that the trial court erred in applying comparative negligence to reduce the damages for breaches of lease and the unfair trade practice. However, the jury did not find that Guastella was comparatively negligent but found that it was 20 percent "at fault." The interrogatory was placed after the jury questions concerning all the concepts of fault: for breaches of contract in bad faith, for intentional interference with Guastella's business, and conspiracy to commit an unfair trade practice. In Veazey v. Elmwood Plantation Associates, Ltd., 93-2818, p. 9 (La. 11/30/94), 650 So.2d 712, 718, the Louisiana Supreme Court stated that "`fault' under civilian theory clearly includes more than just negligence; it extends the gamut from strict liability to intentional torts." The Louisiana Supreme Court held that the theory of comparative negligence could apply to intentional torts on a case by case basis. In the present case the trial court properly reduced the entire award by 20 percent to reflect Guastella's fault, including fault with respect to the breach of contract issues as well as for comparative negligence in tort.

MITIGATING FUTURE LOST PROFITS
Guastella also complains that it was impossible for Guastella to mitigate loss of future profits where Guastella was evicted from the premises and out of business. However, Guastella failed to mitigate profits by failing to put in a drainage system when the flooding occurred before Guastella was evicted. Just as the jury reached its conclusion concerning Guastella's future lost profits, it could have concluded that installation of the drainage system while Guastella was on the premises would have lasted for the remainder of the 15-year lease. The jury did not abuse its discretion in allocating $4,000,000 for Guastella's failure to mitigate loss of future profits.

*161 DISMISSAL OF PERSONAL ACTIONS

Guastella contends that the trial court erred in dismissing the personal actions brought by members of the Guastella family for intentional infliction of emotional distress, abuse of process, and other intentional torts in its judgment dated January 13, 1992. Although Guastella appealed the dismissal of its claims for future lost profits based on the exception of res judicata which was rendered in the same judgment,[1] the family members did not appeal or timely request appellate review with respect to the dismissal of their personal claims based on no causes of action. An untimely appeal precludes review of the family members' personal claims under La. C.C.P. art. 1915(A)(1).[2] See Graham v. Southern Pacific Transp. Co., 619 So.2d 894 (La.App. 3 Cir.), writ denied, 625 So.2d 1044 (La.1993).

RIVERWALK'S LIQUIDATED DAMAGES AND ATTORNEY'S FEES
Guastella finally argues that Riverwalk should not be awarded liquidated damages and attorney's fees because the jury found that Riverwalk breached the lease in bad faith. However, the jury found that Guastella also breached the lease and owed unpaid rent and interest on the rent due, and that Guastella failed to take necessary steps to minimize the liquidated damages. The trial court did not abuse its discretion in awarding Riverwalk liquidated damages in the amount of $402,786 and attorney's fees in the amount of $25,000 based on the lease which gave Riverwalk the right to liquidated damages and attorney's fees for Guastella's breach of the lease.
Accordingly, the judgment of the trial court is amended to delete the amount of $300,000 awarded to Guastella for leasehold improvements. In all other respects the trial court's judgment is affirmed.
AFFIRMED AS AMENDED
SCHOTT, J., dissenting in part.
SCHOTT, Chief Judge, dissenting in part:
The principal issue in this case is whether Guastella carried his burden to prove with reasonable certainty the loss of past and future profits. The burden of proof as to the loss of past profits is usually heavier than that of future profits because the time period for which the loss of past profits is a fixed period in the past whereas the time period for the loss of future profits depends upon factors which may or may not take place.
In this case loss of past profits was for the years 1989-1990 because the lease was terminated by the bankruptcy court at the end of 1990. The jury found that the eventual termination of the lease was the result of breaches committed by Riverwalk. Since damages for these breaches was equated with the loss of profits for 1989-1990, it was unnecessary for the jury to allocate parts of the loss to each breach, but the trial judge required this exercise.
Rivergate argues that Guastella somehow misled the jury by telling them to find a lump sum for lost profits for these two years and spread it around among the four questions as to damages from the four breaches. I do not fault Guastella for this approach because he was forced to deal with the jury interrogatories as they were framed by the judge. I do believe, however, that this procedure may have contributed to a verdict which is not supported by the evidence.
There is nothing in the jury verdict to say that any one of these breaches standing alone would have caused Guastella to lose his *162 lease. On the contrary, the record supports the conclusion that the combination of these breaches was the eventual cause of the termination of the lease. By requiring the jury to break the damages into four parts, the trial court opened the door for overlapping awards. Consequently, Guastella's argument in this court that the sum of the four awards has a relationship with the evidence as to 5,000,000 Riverwalk visitors and $1.5 million figure of gross sales for each of the two years contains an underlying fallacy which presumes that the four awards do not overlap.
The importance of the $1.5 million figure cannot be overestimated in this case. In his excellent original brief counsel for Guastella refers to the $1.5 million figure as one of the "twin pillars" of his evidence along with the 5 million visitor figure. This is so because it provides the support for not only past, but future lost profits also. Unfortunately for Guastella, this figure of gross sales is not supported by evidence, but it is more a product of guesswork.
Riverwalk correctly points out that past history of earnings before the breach occurred is the best proof of loss of earnings, but that history didn't exist in this case. The first breach occurred shortly after the business opened. Riverwalk also argues that a comparison with a neighboring restaurant would have probative value, but Guastella points to several distinctions between his restaurant and the neighbor which make a comparison questionable. Nevertheless, the burden of proof was on Guastella.
In order to carry this burden Guastella relied almost exclusively on some notes and statements made by Riverwalk's manager that referred to the $1.5 million figure as a "projection", an "aspiration", and an eventuality. This was a ten year lease. If the $1.5 million figure was some sort of a goal, there was no reasonable basis for its use as a loss of income figure for the duration of the lease much less the first two years. This $1.5 million figure is also suspect in the light of these facts: 1) The lease provided that the sales level to renew the lease in 1999 was only $1.1 million. (This is from Guastella's original brief.) Surely, if the parties seriously anticipated sales of $1.5 million figure in the first of the ten years, the sales level to renew would have been higher than $1.1 million. 2) The lease provided for an annual percentage rental in addition to the base rental which would kick in when sales reached $815,000. Here again, if the parties seriously anticipated $1.5 million figure in the very first year why would the percentage rental start on such a low figure?
The award for loss of past profits depends entirely upon the $1.5 million figure. Since that figure is not supported by the evidence, the award is excessive. Since this same $1.5 million figure was also used as a basis for the award for future lost profits that award is likewise unsupported. In addition, there is much speculation in the testimony offered by Guastella as to projected traffic counts of customers in the area during the ten or fifteen year life of the lease. Particularly speculative was the projected positive effect on Guastella's business by the opening of the temporary and permanent land based gambling casinos and the operation of several riverboat gambling casinos in the area. Such speculation cannot provide a basis for an award for future lost profits.
While I agree with my colleagues in all other respects, I would reduce the verdict with respect to lost profits.
LOBRANO, Judge, denies rehearing with reasons.
Riverwalk argues that this Court's recent decision in Terrebonne Fuel & Lube, Inc. v. Placid Refining Co., 93-2364 (La.App. 4th Cir. 12/28/94), 649 So.2d 86, writ granted, 95-0654, 95-0671 (La. 5/5/95), 653 So.2d 1181, is applicable and thus Guastella's claim for lost profits is barred by federal res judicata principles. I disagree.
Terrebonne Fuel & Lube, Inc., is distinguishable from the instant case for the reason that the bankruptcy debtor waited until after the federal adjudication (i.e. confirmation of the reorganization plan) to file his damage claim. In the instant case, Guastella's claim was filed in state court before there was a federal adjudication. Thus, the subsequent bankruptcy eviction is not res judicata *163 with respect to the pending damage claims in state court.
The issue of future lost profits, although arguably high, is not beyond the range of the jury's discretion. I have reviewed the evidence in depth, again, and come to the same conclusion I reached on initial review. There is enough evidence to support the jury's conclusions which are not clearly wrong or an abuse of discretion.
NOTES
[1] On January 24, 1992, the trial court denied Guastella's motion for new trial on the exception of res judicata. After applying for writs, Guastella also appealed the ruling denying the new trial and the judgment maintaining the exception of res judicata. On March 30, 1992, the trial court denied Guastella's appeal based on the finding that the supervisory writ application was appropriate for review of the res judicata ruling.
[2] La.C.C.P. art. 1915(A)(1) provides:

A. A final judgment may be rendered and signed by the court, even though it may not grant the successful party all of the relief prayed for, or may not adjudicate all of the issues in the case, when the court: (1) Dismisses the suit as to less than all of the plaintiffs, defendants, third party plaintiffs, third party defendants, or intervenors.